**Sandra RIVERS–FRISON, Appellant,**

v.

**SOUTHEAST MISSOURI COMMUNITY TREATMENT CENTER, Appellee.**

No. 96–3780.

United States Court of Appeals,
Eighth Circuit.

Submitted May 22, 1997.

Decided Jan. 7, 1998.

Eli Karsh, Clayton, MO, argued (Stanley E. Goldstein, Clayton, MO, on the brief), for Appellant.

D. Keith Henson, St. Louis, MO, argued, for Appellee.

Before BEAM, Circuit Judge, HENLEY[1], Senior Circuit Judge, and LOKEN, Circuit Judge.

BEAM, Circuit Judge.

Sandra Rivers–Frison appeals from the district court's order granting Southeast Missouri Community Treatment Center summary judgment in this employment discrimination case. Because we conclude that there are material issues of fact on some of Rivers–Frison's claims, we affirm in part, reverse in part, and remand to the district court for further proceedings.

## I. BACKGROUND

In late 1993 Sandra Rivers–Frison, an African–American female, was hired by Southeast Missouri Community Treatment Center ("the Center") as a substance abuse counselor. Rivers–Frison lived in St. Louis, and commuted over 90 miles to work at the Center, which is located in Farmington, Missouri. Before accepting the position, Rivers–Frison told the Center that she would have to call home every day to check on her son. The Center responded that these calls would not be a problem.

Rivers-Frison asserts that she was initially assigned only African–American clients, and had Anglo–American clients added only after she complained to her supervisor. According to Rivers–Frison, the Center's employees displayed racist attitudes toward African–American clients by making tasteless comments about African–Americans' appearance, anatomy and sexual behavior. Some of these remarks were made in the presence of Jerry Sullivan, who was both human resource coordinator and acting director of the Center. Rivers–Frison reports that Sullivan himself once remarked that too many African–Americans were moving to Farmington.

After Rivers–Frison had been with the Center for seven months, an accounting clerk discovered that Rivers–Frison had charged almost $150.00 in personal long distance phone calls to the Center, spending approximately seventeen hours of work time on long distance calls. The clerk notified Sullivan and Barron Pratte, the Center's executive director. Sullivan confronted Rivers–Frison about the phone charges, telling her that she had violated work rules by failing to keep personal calls to a minimum and by failing to reimburse the Center for the toll calls. Rivers–Frison responded that her co-workers also made personal calls, but offered to pay the charges. Rivers–Frison asserted that she had been authorized to make the calls by one of her supervisors; when questioned, however, the supervisor said that she had only given Rivers–Frison authorization to make one specific toll call and had told Rivers–Frison to reimburse the Center for the charges. Dissatisfied with his meeting with Rivers–Frison, Sullivan conferred with Pratte, who bore the ultimate responsibility for personnel decisions for the Center. Sullivan recommended termination of Rivers–Frison's employment. Pratte concurred and Rivers–Frison was discharged.

Rivers-Frison filed suit, alleging that the Center terminated her because of her race in violation of Title VII. *See* 42 U.S.C. §§ 2000e to 2000e–17. The district court granted the Center's motion for summary judgment and Rivers–Frison appeals.

## II. DISCUSSION

Summary judgment is appropriate only when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Rivers–Frison's claim is one of disparate treatment discrimination, which

---

**1.** Judge Henley died on October 18, 1997. This opinion is consistent with his vote at the panel's conference following oral argument of the case on May 22, 1997.

can be analyzed under one of two frameworks, which we will refer to here as direct evidence or indirect evidence analysis. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 1801–02, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring) (drawing distinction between cases with "direct evidence" and with "no direct evidence" of discrimination). The district court held that Rivers–Frison had failed to identify disputed issues of fact under either rubric. We review that decision de novo. *See Lang v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 114, 139 L.Ed.2d 66 (1997).

### A. Direct Evidence Analysis

■ Rivers–Frison initially argues that the district court erred in entering summary judgment under the direct evidence paradigm. To be entitled to direct evidence analysis, the plaintiff must present "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir. 1993) (quotation omitted).

■ The district court found that Rivers–Frison had failed to present any direct evidence of discrimination. Rivers–Frison contends this was error, pointing to the comments by her co-workers and by Sullivan. However, not every prejudiced remark made at work supports an inference of illegal employment discrimination. We have carefully distinguished between "[c]omments which demonstrate a 'discriminatory animus in the decisional process' or those uttered by individuals closely involved in employment decisions," from "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process.'" *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) (quoting *Price Waterhouse,* 490 U.S. at 278, 277, 109 S.Ct. at 1805, 1804–05 (O'Connor, J., concurring)).

■ Rivers–Frison has failed to identify direct evidence of employment discrimination in this record.[2] The comments made by the Center's staff clearly fall within the category of stray remarks made by non-decisionmakers. Rivers–Frison has failed to show any link between these remarks and her termination. Likewise, although Sullivan was undoubtedly involved in the termination decision, his comment is a "statement[ ] by [a] decisionmaker[ ] unrelated to the decisional process." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J., concurring). Direct evidence of employment discrimination must have some connection to the employment relationship. *See, e.g., Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1318 (8th Cir.1994) (gender discrimination case wherein supervisor said that "women in sales were the worst thing that happened to this company"); *Radabaugh,* 997 F.2d at 449 (age discrimination case wherein corporate documents emphasized youth as a factor to be considered in promotion); and *Beshears,* 930 F.2d at 1354 (age discrimination case wherein decisionmakers repeatedly stated their preference for young employees). Here, Sullivan's remark had no relation to Rivers–Frison's employment status or to the conduct of the Center's business. Thus, it is not proof mandating direct evidence analysis of Rivers–Frison's claims.[3]

---

2. Rivers-Frison also relies on deposition testimony which was not presented to the district court. The record on appeal, however, consists only of evidence presented to the district court. *See* Fed. R.App. P. 10(a). We will not allow a party to place an incomplete record before the district court and then, after correcting any deficiencies noted by that court, to complain of error on appeal. Unlike appellants in the rare cases wherein we have allowed an enlarged record on appeal, Rivers–Frison offers no reason why this evidence was not before the district court. *See Miller v. Benson,* 51 F.3d 166, 168 (8th Cir.1995)

(evidence available only after district court had dismissed the case) and *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 988 F.2d 61, 63–64 (8th Cir.1993) (one party misrepresented facts to district court). We therefore grant the Center's motion to strike and do not consider any evidence that was not presented to the district court.

3. In light of this conclusion we will not consider the impact of section 107 of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1075

## B. Indirect Evidence Analysis

Rivers-Frison argues that even if she did not establish a direct evidence claim, summary judgment is not proper on her alternative claim. In an indirect evidence case, a plaintiff is not required to present direct evidence of discrimination. *See Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). Instead, the plaintiff must meet the now-familiar burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Center concedes that Rivers-Frison has made a prima facie case under *McDonnell Douglas,* and it articulates two legitimate, non-discriminatory reasons for her termination: (1) making excessive phone calls and (2) failure to reimburse the Center for her long distance charges. Thus, the district court properly focused on Rivers-Frison's claim that these contentions are pretextual in nature and designed to mask discriminatory intent.

As to the Center's argument that she made excessive personal calls, Rivers-Frison introduced evidence that this reason for terminating her is not credible: the Center consistently rated her job performance "good"; she told the Center at her job interview that she would need to call home daily to check on her son; management and staff knew about her calls to check on her comatose brother; the Center never told her she was breaking company policy until her seventh month, right before it terminated her; at the time the Center fired Rivers-Frison, no employee had ever been terminated for unauthorized telephone use; and her time on the phone averaged less than eight minutes per day over six months, with most of the calls being made between 11:30 a.m. and 1:30 p.m. or after 5:00 p.m.

Rivers-Frison asserts that the second reason, failure to pay for personal toll calls, is pretextual because the Center should have known she would be making toll calls to family members located outside the local Farmington calling area. We agree with the district court that it strains credulity to believe the Center agreed to pay for unlimited personal long distance tolls because Rivers-Frison commuted to work. However, there is disputed evidence that other employees received monthly bills and paid the Center for their personal long-distance calls, that the Center never gave Rivers-Frison a bill, and that she offered to pay for the phone calls when confronted by Sullivan. We must credit Rivers-Frison's version of these facts. Although a belated attempt to pay for a service taken without permission does not necessarily discredit this proffered reason for discharge, when combined with evidence that the Center did not timely disclose its policies regarding personal, long-distance employee phone calls, it does raise a genuine issue of disputed fact as to whether this reason, too, is unworthy of belief.

In addition, though the Center claims it did nothing more than strictly adhere to its policies regarding personal telephone calls, there is evidence the Center ignored its formal policy regarding employee discipline. That policy requires the employee's supervisor to meet with the offending employee after a "first incident," tell her about the problem, and prepare a file memorandum to record the meeting. After a "second incident," the supervisor issues a written reprimand and forwards a written report to the Executive Director. After further incidents, the supervisor may warn, suspend, or recommend termination. Here, Rivers-Frison's immediate supervisor, Ms. Chapman, never discussed the personal phone calls with her. Instead, Sullivan met once with Rivers-Frison and then went straight to Pratte to recommend termination. Pratt fired Rivers-Frison without talking to her about the problem, despite Pratte's avowed personal policy to "obtain all the information that's available" before terminating an employee, and despite the discipline policy provision that an employee recommended for termination "shall be granted a hearing before management reaches a decision." Although the discipline policy provides that these various procedures may be waived in cases of "serious misconduct, such as a violation of law," a reasonable fact-finder could conclude on the record be-

(codified at 42 U.S.C. § 2000e–2(m)), which, in part, overruled *Price Waterhouse.*

fore us that the Center failed to obey its discipline policy and that this failure renders its invocation of the telephone policies pretextual.

■ Of course, evidence that the Center's proffered reasons for termination were pretextual will only defeat summary judgment if the evidence could persuade a reasonable fact-finder that Rivers–Frison was discharged *because of* intentional race discrimination. *Ryther*, 108 F.3d at 842. Here, the evidence of pretext comes with a backdrop suggesting racial animus: in 1994, Rivers–Frison was one of two African–American employees out of 277, and both were separated by the end of the year; the Center assigned Rivers–Frison only African–American clients until she complained; a Center employee referred to Rivers–Frison as "one of those uppity niggers"; Center employees made comments about African–Americans' hair, anatomy, and sexual behavior at staff meetings, and Sullivan, who ran the meetings, either remained silent or laughed; and Sullivan, who recommended that Rivers–Frison be terminated, once commented that too many African–Americans were moving to Farmington. While these stray remarks fall short of being direct evidence of discrimination, they tend to prove that any pretextual reasons for discharge were proffered to hide intentional race discrimination. Therefore, the district court erred in granting summary judgment because questions of fact remain on the indirect evidence prong of Rivers–Frison's claim.

## III. CONCLUSION

For the forgoing reasons the decision of the district court is affirmed in part and reversed in part. The case is remanded for proceedings not inconsistent with this opinion.